**CENTRAL TELEPHONE COMPANY,**
**Relator,**

v.

**MINNESOTA PUBLIC UTILITIES**
**COMMISSION, Respondent.**

**No. C7–84–764.**

Court of Appeals of Minnesota.

Oct. 9, 1984.

Richard J. Johnson, Wiese & Cox, Ltd., Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., Allen E. Giles, Sp. Asst. Atty. Gen., Thomas M. O'Hern, Jr., Sp. Asst. Atty. Gen., St. Paul, for respondent.

Heard, considered and decided by POPOVICH, C.J., and PARKER and LANSING, JJ.

## OPINION

POPOVICH, Chief Judge.

Relator appeals a final order by the Minnesota Public Utilities Commission in relator's interim rate case. Relator claims the accelerated amortization of its deferred tax reserve surplus ordered by the Commission was based upon an error of law. Relator also claims the Commission's determination of relator's capital structure was arbitrary, capricious, and affected by an error of law. We affirm in part, and reverse and remand in part.

## FACTS

Central is a telephone company providing service in Minnesota, Iowa, North Carolina, and Nevada. Central Telephone Company—Minnesota Division (CTCM) is Central's operational division providing service in Minnesota. Central's only business is providing telephone service, and it currently provides service to 45 telephone exchanges in central and southwestern Minnesota. Central is a wholly owned subsidiary of Centel Corporation. Centel is involved in several non-telephone businesses through its own activities and those of its subsidiaries.

Central is currently eligible for and uses accelerated depreciation for federal income

tax purposes under Internal Revenue Code (I.R.C.) § 167. The difference between depreciation for income tax purposes and for rate making purposes is recorded in a deferred tax reserve account. This account is treated as a reduction in the amount Central has invested in telephone equipment.

This treatment benefits customers by reducing Central's rate base upon which it is entitled to earn a fair rate of return. The reserve account is maintained until the telephone equipment has been fully depreciated for both tax and rate making purposes. This method of accounting is called "normalization" accounting and is required under I.R.C. § 167($l$) and regulations promulgated under section 167($l$).

In 1979, the maximum federal income tax rate was reduced from 48 to 46 percent. The portion of Central's tax reserve account accumulated before 1979 reflects the 48 percent maximum federal income tax rate. Consequently, the tax reserve account contains a surplus of $165,571.

Central proposed the surplus be amortized to income over the life of the related telephone equipment. The Attorney General's office recommended the deferred tax reserve surplus be amortized over a three year period. Central objected to this proposal claiming a three year amortization would jeopardize their eligibility to use accelerated depreciation under I.R.C. § 167($l$). Should it lose eligibility to use accelerated depreciation, Central claims customer rates would necessarily increase over $1 million. The Commission ordered Central to use a three year amortization.

Central proposed its actual capital structure be used to determine the rate of return. The Department of Public Service (DPS) and the Attorney General recommended that the consolidated capital structure of Centel, Central's parent, be used to determine rate of return. These capital structures are set forth below:

| Component | Central | Centel |
|---|---|---|
| Common stock | 58.09% | 43.39% |
| Preferred stock | 2.74% | 2.85% |
| Long-term debt | 39.17% | 53.76% |
| | 100.00% | 100.00% |

Central's long-term debt and preferred stock is approximately $316 million. This portion of Central's capital is all publicly held, except for $20 million in miscellaneous debt. Central's common stock is valued at $434 million, and all of its common stock is owned by Centel.

Central presented evidence in support of its actual capital structure. Central claimed increased risks in the telephone industry justified the 58.09% common stock structure. Central also claimed adoption of Centel's capital structure would lower its bond ratings and increase the cost of its debt.

The DPS and Attorney General presented several arguments in support of their claim that Central's actual capital structure was unreasonable for rate making purposes. The Commission was persuaded by these contentions and adopted them in its order:

[T]he Commission finds that the DPS and the RUD have convincingly demonstrated that the Company's proposed capital structure is inappropriate for purposes of this proceeding.

The record of this proceeding indicates that the Company acknowledges that the total business risk of CTCM and Central is less than that of Centel. The Commission finds the Company proposal to adopt Central's capital structure * * * conflicts with the general business principle that a firm with higher risk should have a higher equity component than a firm facing a lower risk. The unreasonableness of the Company's proposal is further demonstrated by the fact that the average equity component of the six telephone companies the Company selected for its own rate of return analysis is 42.5 percent, which is comparable to the 43.39 percent equity component of Centel, but which is significantly lower than the 58.10 percent equity component of Central * * *.

Further, the Commission finds that the record indicates that the Company acknowledges that the percentage of equity capital may vary from 20 to 80 percent without affecting its overall cost of capi-

tal, that its proposed capital structure is above the minimum capital structure that is necessary to allow it to meet its fixed charge obligations, and that adoption of the Centel consolidated capital structure for ratemaking purposes will not preclude the Company from access to capital markets. Further, the Commission notes that its decision to adopt the use of Centel's capital structure is consistent with its decision in the Company's last general rate case, *Central,* P–405/GR–81–231.

## ISSUES

1. Was the Commission's order requiring Central to use accelerated amortization for the company's deferred tax reserve surplus based upon an error of law?

2. Was the Commission's adoption of a new burden of proof for determining capital structure in rate making proceedings arbitrary and capricious or affected by an error of law?

## ANALYSIS

### I.

A. *Tax Reserve Surplus.*

1. *Scope of Review.*

▇▇▇ This court is not bound by an administrative agency's determination on a question of law. The proper method of amortizing Central's deferred tax reserve surplus is a question of federal tax law. Thus, we need not give deference to the Commission's determination. *See Arvig Telephone Co. v. Northwestern Bell Telephone Co.,* 270 N.W.2d 111, 114 (Minn. 1978); *No Power Line, Inc. v. Minnesota Environmental Quality Council,* 262 N.W.2d 312, 320 (Minn.1977).

2. *I.R.C. § 167(l) and Applicable Regulations.*

Appellant claims the Commission's order violates Treas.Reg. § 1.167(1)–1(h)(2)(i) (1974). The regulation states:

*Adjustments to reserve.* (i) * * * With respect to any account, the aggregate amount allocable to deferred tax under

section 167(1) shall not be reduced except to reflect the amount for any taxable year by which Federal income taxes are greater by reason of the prior use of different methods of depreciation under subparagraph (1)(i) of this paragraph. An additional exception is that the aggregate amount allocable to the deferred tax under section 167(1) may be properly adjusted to reflect asset retirements or the expiration of the period for depreciation used in determining the allowance for depreciation under section 167(a).

*Id.* Relator contends the exceptions contained in Treas.Reg. § 1.167(1)–1(h)(2)(i) (1974) are exclusive and preclude accelerated amortization of the deferred tax reserve surplus.

The four state supreme courts and the majority of state utilities commissions to have addressed this question held accelerated amortization of deferred tax surplus permissible under I.R.C. § 167(*l*). *See Alabama Gas Corp. v. Alabama Public Service Commission,* 425 So.2d 430, 440–41 (Ala.1982); *New England Telephone and Telegraph Co. v. Public Utilities Commission,* 470 A.2d 772, 776–81 (Me. 1984); *State ex rel. Allain v. Mississippi Public Service Commission,* 435 So.2d 608, 616–17 (Miss.1983); *In re Rates and Charges of Mountain States Telephone and Telegraph Co.,* 653 P.2d 501, 510–511 (N.M.1982); *see, e.g., In re General Telephone Co. of California,* 37 P.U.R.4th 127, 168 (Cal.Pub.Util.Comm'n 1980); *In re Iowa Public Service Co.,* 46 P.U.R.4th 339, 352 (Iowa State Com. Comm'n 1982); *In re South Central Bell Telephone Co.,* 58 P.U. R.4th 196, 208 (Ky.Pub.Serv.Comm'n 1984); *In re Sierra Pacific Power Co.,* 40 P.U. R.4th 186, 227 (Nev.Pub.Serv.Comm'n 1980); *In re Brooklyn Union Gas Co.,* 39 P.U.R.4th 388, 405 (N.Y.Pub.Serv.Comm'n 1980).

The purpose of a deferred tax reserve account is "to reflect the total amount of deferral of federal tax *liability* resulting· from the use with respect to all of its public utility property of such different

methods of depreciation." Treas.Reg. § 1.167(1)–(1)(h)(1)(b) (emphasis added).

[N]either Congress nor the Internal Revenue Service intended to predicate the availability of accelerated depreciation on the perpetual maintenance in the deferred tax reserve of monies that had been rendered supernumerary to the satisfaction of future tax liability.

*New England Telephone,* 470 A.2d at 779. Many state commissions have used accelerated amortization for deferred tax reserve surplus since 1979 when the maximum tax rate was lowered.

The assumption that amortization of excess deferred taxes will not jeopardize accelerated depreciation has become increasingly widespread in the face of prolonged nonresponsiveness by the Internal Revenue Service.

*Id.* at 780; *see State ex rel. Allain,* 435 So.2d at 616.

The Minnesota Public Utilities Commission began ordering accelerated amortization of deferred tax reserve surplus in 1982. *See In re Petition of Northwestern Bell Telephone Co.,* Docket No. P–421/GR–82–203, slip op. at 13 (Minn.P.U.C. April 20, 1983) [hereinafter cited as *Petition of Northwestern Bell*]. The Commission waited three years for the IRS to issue rulings or regulations on this issue before making its order. *See id.* at 12–13. Noting that many states had ordered accelerated amortization, *id.* at 13, the Commission stated:

The Commission finds that the reduction in the federal income tax rate from 48% to 46% was an extraordinary event that effectively created a surplus in the Company's accumulated deferred federal income tax account * * *. The Commission concludes that it is appropriate to return that surplus accumulation to ratepayers over a three year period so as to insure that a greater proportion of the amortization will be received by ratepayers who actually paid income taxes at the prior 48% tax rate. * * * The Commission does not intend to take any action that will ultimately make the Company

ineligible to claim the benefits of accelerated tax depreciation, and it does not believe that the adjustment accepted herein is such an action.

*Id.; accord In re Petition of United Telephone Co.,* Docket No. P–430/GR–82–200, slip op. at 7–8 (Minn.P.U.C. Apr. 20, 1983).

The Commission's conclusion appears justified. The IRS has not clarified these issues despite numerous requests. Moreover, the purpose of the deferred tax reserve account is to reflect actual liabilities. Accelerated depreciation does not deprive the treasury of significant revenues because the deferred tax reserve account reflects a nonexistent liability.

[T]he net effect of amortization on the government's revenue is essentially the same as if the utilities had never accrued an excess in deferred taxes in the first place.

\* \* \* \* \* \*

Of course, this disregards fluctuations in tax rates, but our point is that amortization would not result in any significant loss to the government coffers—especially compared with the double revenue loss produced by the 2% reduction in corporate tax rates that is the root of this particular problem.

*New England Telephone,* 470 A.2d at 780, 780 n. 13.

Appellant contends the IRS would follow AFB Opinion No. 11, which states:

The deferred taxes * * * are not adjusted for subsequent changes in tax rates * * *.

The Accounting Principles Board, however, provides:

[D]ifferences may arise in the application of generally accepted accounting principles as between regulated and nonregulated businesses, because of the effect in regulated businesses of the rate-making process, a phenomenon not present in nonregulated businesses.

AFB Opinion No. 2 addendum. Assuming the IRS will issue regulations at some point, IRS reliance on AFB Opinion No. 11 is speculative at best. *Cf. Alabama Gas*

*Corp.*, 425 So.2d at 441 (accelerated amortization does not violate general accounting principles).

Appellant's reply brief refers to several utilities commission decisions denying accelerated amortization. The most recent of these cases is 1981, prior to the current trend of allowing accelerated amortization.

■ We believe the Commission's decision is not based upon an error of law. The majority of jurisdictions have adopted accelerated amortization of deferred tax reserve surplus. These jurisdictions and the Commission have carefully considered the issue and determined accelerated amortization does not violate I.R.C. § 167(*l*) or regulations promulgated thereunder. IRS silence in the face of this growing practice can reasonably be construed as acquiescence.

## II.

### A. *Capital Structure.*

### 1. *Standard of Review.*

■ A decision by the Commission may be overturned if that decision was arbitrary or capricious. Minn.Stat. § 14.-69(f) (1982).

[A]n agency determination is arbitrary and capricious when it represents the agency's will rather than its judgment.

\* \* \* \* \* \*

"An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent."

*Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 348, 352, 353 (Minn.Ct.App.1983) (citations omitted); *see also Markwardt v. State Water Resources Board,* 254 N.W.2d 371, 374 (Minn.1977). As noted above, this court may overturn a decision by the Commission that is affected by an error of law. Minn. Stat. § 14.69(d) (1982); *see* discussion, *supra.*

### 2. *Was the Commission's order arbitrary or capricious or affected by an error of law?*

Appellant's main contention is that the Commission erroneously and arbitrarily applied a new burden of proof in determining the capital structure issue. Appellant claims the new standard violates the case law set out in *Northwestern Bell Telephone Co. v. State,* 299 Minn. 1, 216 N.W.2d 841 (1974) [hereinafter cited as *Northwestern Bell* ], and *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission,* 342 N.W.2d 348 (Minn.Ct. App.1983).

The relevant portion of the Commission's order states:

[T]he Commission concludes that the DPS has correctly described the Company's burden of proving the appropriateness of its proposed capital structure in ratemaking proceedings. The Company has the ultimate burden of proving that the capital structure it proposes is appropriate and reasonable. Minn.Stat. § 237.075, subd. 4 (1982). The Commission establishes the following procedure for determining the appropriate capital structure:

1. The Company has the burden of coming forward and establishing by competent evidence a proposed capital structure.

2. A rebuttable presumption arises that the Company's proposed capital structure is reasonable and appropriate.

3. Other parties have the burden of going forward with evidence to rebut or meet the presumption that the proposed capital structure is appropriate. This burden does not shift to other parties the Company's burden of proof.

4. The risk of nonpersuasion or ultimate burden of proof remains with the Company. Therefore the Company must meet or rebut contrary evidence or the presumption of appropriateness of the Company's proposed capital structure ceases to exist.

Appellant cites *Northwestern Bell,* 299 Minn. at 14–15, 216 N.W.2d at 850, claim-

ing the Commission could not reject Central's actual capital structure. The applicability of *Northwestern Bell* to this case "is a question of law." *Peoples*, 342 N.W.2d at 351. "*Northwestern Bell* applies to utilities that have an objective capital structure of their own." *Id.* at 352. Although the Commission's order asserts CTCM has no objective capital structure, the facts concerning capital structure in *Northwestern Bell* and this matter are very similar. *See Peoples*, 342 N.W.2d at 351.

■ The Commission concluded *Northwestern Bell* did not control this matter and adopted the DPS position:

> [T]he DPS asserted that the *Northwestern Bell* case cited by the Company no longer controlled the issue of burden of proof because Minn.Stat. § 237.075, Subd. 4 (1982) now places the burden of proof upon the telephone company. This section was added to the Minnesota law in 1977, subsequent to the Supreme Court decision in *Northwestern Bell.*

> \* \* \* \* \* \*

> [T]he Commission concludes that the DPS has correctly described the Company's burden of proving the appropriateness of its proposed capital structure in ratemaking proceedings.

The Commission's implied conclusion that *Northwestern Bell* was overruled in 1977 by the passage of Minn.Stat. § 237.075, subd. 4 contradicts this court's statement in *Peoples* that "*Northwestern Bell* applies to utilities that have an objective capital structure of their own." *Peoples*, 342 N.W.2d at 352. The Commission's conclusion is, therefore, based upon an error of law.

Another problem with the Commission's conclusion is the Commission's strict adherence to *Northwestern Bell* in recent cases. As of 1983, the Commission consistently applied *Northwestern Bell* stating:

> [T]he Minnesota Supreme Court indicated that the Commission may not readily substitute its judgment for that of company management on the issue of appropriate capital structure. While this

decision does not give utility management absolute discretion, the commission believes that *the capital structure must be found unreasonable or imprudent before the Commission chooses a different structure.*

*Petition of Northwestern Bell*, Docket No. P–421/GR–82–203, slip op. at 32 (emphasis added); *see United Telephone*, Docket No. P–430/GR–82–200, slip op. at 24.

■ Under the Commission's precedent, Central's capital structure should have been rejected only if found to be "unreasonable or imprudent." The Commission is not bound to a strict adherence to its precedents in *Petition of Northwestern Bell* and *United Telephone. Peoples*, 342 N.W.2d at 352–53. The Commission may, in fact, believe its findings in those two rate cases were erroneous. Those cases were, however, decided long after Minn.Stat. § 237.-075, subd. 4 was passed in 1977. Both cases followed the Minnesota Supreme Court's decision in *Northwestern Bell.* Moreover, the Commission did not discuss these cases in adopting its new burden of proof and thus did not give reasons for departing from its prior norms and decisions. Applying new standards in this matter was arbitrary and capricious. *Peoples*, 342 N.W.2d at 352–53.

## DECISION

The Commission's order that Central amortize its deferred tax reserve surplus over a three year period was not based upon an error of law.

The Commission's finding concerning Central's capital structure was affected by an error of law and was arbitrary and capricious. We remand this matter to the Commission for a determination in accordance with the principles prescribed by this court. *Reserve Mining Co. v. Minnesota Pollution Control Agency*, 267 N.W.2d 720, 723 (Minn.1978).

Affirmed, reversed and remanded in part.