**PEOPLES NATURAL GAS COMPANY, A DIVISION OF INTERNORTH, IN-CORPORATED, Petitioner, Appellant,**

v.

**MINNESOTA PUBLIC UTILITIES COMMISSION, Respondent.**

No. C7-83-1208.

Court of Appeals of Minnesota.

Dec. 14, 1983.

Elmer B. Trousdale, Oppenheimer, Wolff, Foster, Shepard & Donnelly, St. Paul, for petitioner, appellant.

Karl W. Sonneman, James T. Jarvis, Sp. Asst. Atty. Gen., St. Paul, Robert S. Lee, Mackall, Crounse & Moore, Minneapolis, for intervenor-respondents Erie Mining Co. & Hibbing Taconite Co.

Kenneth A. Nickolai, Sp. Asst. Atty. Gen., St. Paul, for intervenor-respondent Minnesota Department of Public Service.

## OPINION

POPOVICH, Chief Judge.

This is an appeal by Peoples Natural Gas (Peoples) from the order of James M. Lynch, District Court Judge, Ramsey County, dated July 20, 1983. The order affirmed in part and modified in part the January 28, 1983 order of the Minnesota Public Utilities Commission (PUC) in Peoples' 1982 rate proceeding. (*Peoples Natural Gas Company*, Docket No. G–011/GR–82–65) Peoples claims the PUC erred when it imputed a hypothetical capital structure to Peoples and also acted arbitrarily and capriciously in imputing the hypothetical capital structure for rate of return purposes, using Peoples' parent company's capital structure for calculation of interest expense and allowing a return on equity of only 14.9%. The trial court affirmed the PUC order on all issues except the determination of interest expense. It modified the PUC order to permit recalculation of interest expense. We affirm.

## FACTS

Appellant Peoples is a retail distributor of natural gas in several states, including Minnesota. Peoples serves parts of southern and east central Minnesota, several communities in northwest Minnesota, and six taconite companies on the Iron Range. Its retail natural gas operations in Minnesota qualify as a public utility under the provisions of Minn.Stat. Chapter 216B (1980), then applicable.

Peoples filed a general rate increase application with the PUC on January 29, 1982, for authority to change its schedule of rates for sales of natural gas to its customers within the State of Minnesota. The notice was filed pursuant to Minn.Stat. § 216B.16 (1980). The proposed change in rates for sales of gas to customers would increase annual gross revenues by $6,919,-

000, which represents an increase of approximately 3.8%.

On February 26, 1982, the PUC accepted Peoples' filing, suspended the proposed schedules, and directed the Department of Public Service (DPS) to initiate an investigation to determine the reasonableness of the proposed change in rates. Peoples placed the interim rates into effect on May 1, 1982, subject to refund if the PUC were ultimately to order a smaller increase.

On March 30, 1982, the PUC directed that a contested case hearing be held to determine the reasonableness of the proposed rate increase. The DPS, Eveleth Taconite Company, Hanna Mining Company, United States Steel Corporation, Reserve Mining Company, Erie Mining Company, Hibbing Taconite Company, and Inland Steel Mining Company, were allowed to intervene in the proceeding.

Evidentiary hearings were held before Hearing Examiner Harry A. Crump in St. Paul, Minnesota, on June 29 and 30, July 1, August 23, 24 and 25, and September 27 and 28, 1982. Testimony at these hearings was sponsored by Peoples, the DPS, Erie Mining Company and Hibbing Taconite Company (Erie-Hibbing). The Examiner issued his Report on December 1, 1982. Following exceptions to the Examiner's Report and oral argument, the PUC issued its Order on January 28, 1983. On March 16, 1983, the PUC denied a request for reconsideration and rehearing. Peoples appealed these orders to Ramsey County District Court pursuant to Minn.Stat. § 14.63 (1983).

Peoples is an operating division of Inter-North, Incorporated (InterNorth). Inter-North is a publicly-held corporation consisting of three divisions and 25 subsidiaries. Some of InterNorth's operations are regulated, others are not.

All of Peoples' capital, including common equity, preferred equity, short and long term debt, is obtained from InterNorth. Peoples does not, itself, issue any common or preferred stock, nor bonds, notes or other evidence of debt.

InterNorth finances all of its operations through a centralized capital structure.

Debt and equity are not identified and assigned to a particular division or subsidiary. Each operation adopts InterNorth's capital structure as its own.

The PUC rejected Peoples use of InterNorth's capital structure for setting rates. Instead, the PUC imputed a hypothetical capital structure to Peoples. The capital structure selected was the average of ten gas distribution companies comparable to Peoples. The use of this hypothetical capital structure contributed to the reduction in the authorized rate of return on common equity to approximately $5,065,000.

The following chart compares Peoples' proposed capital structure with PUC's hypothetical and imputed capital structure in the order appealed from:

|  | PEOPLES' PROPOSAL (InterNorth's Actual Capital Structure) | PUC ORDER (Hypothetical Capital Structure) |
|---|---|---|
| Common Equity | 54.92% | 49.90% |
| Preferred Stock | 1.01% | 7.80% |
| Long Term Debt | 41.79% | 42.30% |
| Short Term Debt | 2.28% | 0.00% |
|  | 100.00% | 100.00% |

## ISSUES

The specific issues raised on appeal are:

1. Was the PUC required to find Peoples' capital structure proposal unreasonable before imputing a hypothetical capital structure?

2. Did the PUC act arbitrarily and capriciously by:

   a) departing from its prior decisions, including the 1981 Peoples' case, which rejected imputing a hypothetical capital structure?

   b) imputing a hypothetical capital structure?

   c) allowing Peoples a rate of return on common equity of only 14.9%?

   d) using a hypothetical capital structure for rate of return purposes but InterNorth's capital structure for calculating Peoples' interest expense?

## ANALYSIS

A. *Scope of Review:*

In reviewing decisions of administrative agencies, the court is governed by Minn.

Stat. § 14.69 (1982), the Minnesota Administrative Procedures Act. The statute provides that:

In a judicial review under sections 14.63 to 14.68, the court may affirm the decision of the agency or remand the case for further proceedings; or it may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the administrative finding, inferences, conclusion, or decisions are:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

In reviewing actions of an agency, the substantial evidence test is applied. *Appeal of Signal Delivery Service*, 288 N.W.2d 707, 710 (Minn.1980). The Minnesota interpretation of the substantial evidence test is found in *Taylor v. Beltrami Electric Co-Op., Inc.*, 319 N.W.2d 52 (Minn.1982):

We view that by the 'substantial evidence' test is meant: 1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2) more than a scintilla of evidence; 3) more than 'some evidence'; 4) more than 'any evidence'; and 5) evidence considered in its entirety. There are correlative rules or principles that must be recognized by a reviewing court, such as: 1) unless manifestly unjust, inferences must be accepted even though it may appear that contrary inferences would be better supported; 2) a substantial judicial deference to the fact-finding processes of the administrative agency; and 3) the burden is upon the appellant to establish that the findings of the agency are not supported by the evidence in the record, considered in its entirety.

*Id.* at 56. See also *Crookston Cattle v. Minnesota Department of Natural Resources*, 300 N.W.2d 769, 777 (Minn.1981). (Agency decisions are presumed correct by the court.)

■ A separate ground for rejecting agency findings is that they are arbitrary and capricious. An agency finding is arbitrary and capricious when its determination represents its will and not its judgment. *Markwardt v. State Water Resources Board*, 254 N.W.2d 371, 374 (Minn.1977).

### B. *Hypothetical Capital Structure:*

■ Peoples' primary argument is that the PUC was required to find Peoples' capital structure unreasonable before imputing a hypothetical capital structure. Peoples cites *Northwestern Bell Telephone Company v. State*, 299 Minn. 1, 216 N.W.2d 841 (1974), as the source of this requirement. In that case, the court reviewed the Public Service Commission's order and concluded:

We have difficulty accepting the concept that in a rate case of this kind the state may collaterally attack the judgment of the company in maintaining its embedded debt at a low figure. We agree with the position of the company that this is a discretionary matter of management which, in the light of soaring interest rates, seems to vindicate the company's decision to keep its debt obligations to a minimum.

*Id.* at 14, 216 N.W.2d at 850.

The applicability of *Northwestern Bell* to Peoples' case is a question of law. We conclude that *Northwestern Bell* is not applicable to this case.

Northwestern Bell was an Iowa corporation. It issued its own stock and floated its own debt. Although it was wholly owned by AT & T, Northwestern Bell maintained a separate and independent capital structure. This is not true for Peoples.

Peoples is a division of InterNorth, Inc. Peoples does not and has never issued stock or debt of its own. InterNorth supplies all of Peoples' capital, but does not assign debt or equity to Peoples individually.

The *Northwestern Bell* case involved the appeal by the state of a Commission decision approving the capital structure proposed by Northwestern Bell on the grounds that the Commission's factual finding was arbitrary and capricious. The Supreme Court held that the state was in no position to challenge the Commission's finding because the state made:

[N]o attempt to refute the company's computation of the relation between equity and debt, and we hold that on this record it was proper for the commission and the district court to add 58.92 percent of trended value to the company's book value for purposes of establishing rate base.

216 N.W.2d 850. The Supreme Court conducted its review on the basis of the record before it and found that the Commission decision approving the company proposed capital structure was supported by the evidence.

■ *Northwestern Bell* applies to utilities that have an objective capital structure of their own. The fact that another entity supplies the utilities' operating capital may be grounds for proposing the supplier's capital structure. It is not, however, grounds for deferring to that capital structure proposal in setting rates when other substantial evidence is in the record.

InterNorth finances 28 businesses out of one capital structure. The risks associated with these businesses, as well as their capital needs, vary. So would their capital structures if they operated independently. InterNorth's capital structure is an approximation of Peoples' capital structure. This approximation deserves consideration with the other hypothetical proposals, but nothing more.

The other issues raised on appeal ask whether the PUC acted arbitrarily or capriciously. In *Village of Goodview v. Winona Area Industrial Development Association,* 289 Minn. 378, 184 N.W.2d 662 (1971), the court stated:

Where there is room for two opinions on the matter, such action is not "arbitrary and capricious," even though it

may be believed that an erroneous conclusion has been reached.

*Id.* at 381, 184 N.W.2d at 664. (Quoting *Brown v. Wells,* 288 Minn. 468, 472, 181 N.W.2d 708, 711 (1970)

The court also said:

Since we cannot say that the commission's decision was entirely wrong, there is no basis for substituting our judgment for that of the commission upon a question which the commission is authorized by law to determine.

*Id.*

The court in *Brown* also said:

We cannot say that this policy is clearly wrong and, accordingly, hold that there is no basis for substituting our judgment for that of League authorities upon a question which it is authorized by law to determine.

*Brown* at 473, 181 N.W.2d at 711.

In another review of the standard, the court held that an agency determination is arbitrary and capricious when it represents the agency's will rather than its judgment. *Markwardt v. State Water Resources Board,* 254 N.W.2d 371, 374 (Minn.1977). Guided by these principles, we find that the PUC did not act arbitrarily or capriciously.

■ Peoples contends the imputation of a hypothetical capital structure was arbitrary and capricious because previous PUC decisions rejected imposition of a hypothetical capital structure. The PUC's failure to explain its departure from these cases is alleged to be arbitrary and capricious.

The accepted rule regarding an agency's duty to adhere to its precedents is stated in *McHenry v. Bond,* 668 F.2d 1185 (11th Cir.1982).

"An administrative agency concerned with furtherance of the public interest is not bound to rigid adherence to precedent." *New Castle County Airport Commission v. CAB,* 371 F.2d 733 (D.C. Cir.1966), *cert. denied sub. nom. Board of Transportation v. CAB,* 387 U.S. 930, 87 S.Ct. 2052, 18 L.Ed.2d 991 (1967). This does not mean, however, that an

agency may abandon its own precedent without reason or explanation. "An agency must either conform to its prior norms and decisions or explain the reason for its departure from such precedent." *Mississippi Valley Gas Co. v. FERC,* 659 F.2d 488, 506 (5th Cir.1981). *Id.* at 1192. *See also Hatch v. Federal Energy Regulatory Commission,* 654 F.2d 825, 834 (D.C.Cir.1981).

The PUC usually adopts the regulated company's capital structure, but not always. In *Central Telephone Company,* Docket No. P–401/GR–81–231 (Minn. PUC May 22, 1981), the PUC dealt with a situation similar to Peoples. CTC, a division of Central Telephone & Utilities, did not issue debt or equity of its own. The PUC rejected the capital structure proposed by CTC, saying:

> It is important to recognize that the Company has no *objective* operating capital structure and issues no debt or equity of its own. Therefore, the Commission must impute a capital structure to the Company for purposes of determining a fair overall cost of capital in this proceeding.

In *Northern States Power Company,* Docket No. G–002/GR–78–1052 (Minn. P.S.C. September 21, 1979), the PSC rejected NSP's actual capital structure saying:

> The Commission is willing to allow NSP's management to pursue whatever course of action they feel is prudent in regard to the method of issuing common equity. The Commission is here concerned with the proper level of equity to be used for rate-making purposes. The actual level of equity has now risen above the level repeatedly labeled as reasonable by the Commission.
>
> Therefore, the Commission will adopt a hypothetical capital structure for NSP. The common equity position will be 40%, the upper limit of reasonableness.

*Id.* at 32. While the explicit warning to NSP of the consequences of exceeding a 40% equity level distinguishes this case, this distinction should not be overstated.

In Peoples' first rate case, *Peoples Natural Gas Company,* Docket No. G–011/GR–80–850 (Minn. P.U.C. November 25, 1981), the PUC adopted InterNorth's capital structure. In doing so, the PUC indicated two conditions that must be shown to exist before another capital structure would be substituted. First, Inter-North must be proven riskier than typical gas distributors. Second, this excess risk must be the cause of an equity ratio that is too high. The PUC concluded that the record there did not establish the existence of either condition.

What changed the result in the present Peoples' case was the evidence in the record. The PUC did not depart from the principles it established. The PUC's order makes this clear:

> The Commission finds on this record that InterNorth presents greater risk to the investor than does a typical gas distribution company. The Commission finds that that risk has manifested itself in, at least, a higher common equity ratio than is typical for a gas distribution utility, and that it would be unreasonable to require People's customers to pay for that higher equity ratio. The Commission concludes it must not impute Inter-North's capital structure to Peoples for ratemaking in this case.

*Peoples Natural Gas Company,* Docket No. G–011/GR–82–65 at 14, 15.

The PUC devoted four pages of its order to sifting testimony regarding the appropriate capital structure for Peoples. *See Id.* 12–15. The evidence supporting the conclusion that InterNorth is riskier than a typical gas distributor is overwhelming. Similarly, there is sufficient evidence to sustain the conclusion that the risk associated with InterNorth makes its equity ratio too high for Peoples. While we would prefer a more detailed explanation and findings of the facts relating to its conclusion, the PUC's decision represents a reasonable judgment and, therefore, is not arbitrary or capricious.

Prior to selecting the unweighted average hypothetical capital structure for Peo-

ples, the PUC examined the other three proposals. The Commission also enumerated each party's criticisms of the others' proposals.

Testifying for Intervenor Erie-Hibbing, Ms. Cynthia Bezik rejected use of Inter-North's capital structure for Peoples. Ms. Bezik testified:

> InterNorth is significantly more risky than an average natural gas distribution company, as is demonstrated by a comparison of the betas.... According to *Value Line*, InterNorth's beta equals 1.00, which indicates average volatility. However, for Mr. Olson's (Peoples' witness) eight comparable companies listed in *Value Line*, the betas ranged from .45 to .85, with four companies having a beta of .60. Thus, it can be concluded that a "pure" natural gas distribution company exhibits less volatility and less risk than InterNorth. Therefore, on the basis of comparable risk, utilizing the required return for InterNorth as a proxy for Peoples is *not* appropriate.

Dr. Eilor Amit, the rate analyst of the DPS, also compared the operation risks of InterNorth and gas distribution companies comparable to Peoples. His group of comparable companies was different than the others, but his conclusion was identical to Ms. Bezik. Dr. Amit testified that:

> PNG (Peoples) is a distribution gas company. Since a typical distribution company has a much lower equity ratio than InterNorth any attempt to adopt the capital structure of InterNorth for PNG would result in excessive return for PNG. It would mean that the rate payers of PNG are asked to pay for the extra risks of the other ventures of InterNorth.

The PUC found this testimony outweighed the company's general assertions that InterNorth's capital structure was similar to the typical gas distributor's structure.

Each of the remaining capital structure proposals was derived from a group of gas distributors comparable to Peoples. The PUC adopted the unweighted average capital structure of Dr. Olson, Peoples' rate of return witness. His methodology in formulating the comparable group was understandable and justifiable. Moreover, his list represented Peoples' determination of the companies most comparable to Peoples. Selection of this capital structure was not arbitrary or capricious.

## C. *Return on Equity:*

■ We reach the same conclusion with respect to Peoples' return on common equity claim. The PUC authorizing a 14.9% return on its equity capital is supported by substantial evidence in the record. All witnesses agreed that since Peoples did not issue any common stock, a proxy would have to be used. The discounted cash flow calculation made by each witness involved a number of judgments, such as the dividend yield measuring period and investors' expected rate of growth.

A review of the PUC Order indicates that the PUC was conversant with the evidence offered by all of the witnesses and carefully explained the basis on which it sifted that evidence to arrive at its final conclusion.

The PUC recognized that the cost of equity capital would be affected by the selection of a different capital structure than that proposed by Peoples. Because of this, it increased the allowed rate of return from 14.25% to 14.90%, stating:

> Ms. Bezik recommended that if such a capital structure were to be adopted, it would be appropriate to make an adjustment for financing by issuing additional equity. Although the Commission ordinarily has not made such an adjustment for a company not about to issue stock, it has been persuaded by Ms. Bezik's testimony that it would be appropriate to do so in this case.

This decision emphasizes the careful consideration that was involved in the PUC action. To compensate for its adoption of a lower equity ratio than sought by Peoples, the PUC specifically made an upward adjustment on the rate of return.

D. *Interest Expense:*

The final issue on appeal concerns the PUC's calculation of Peoples' income tax interest expense. The PUC used Inter-North's weighted cost of debt in determining Peoples' interest expense, even though a different capital structure was imputed to Peoples. The justification offered was the PUC's policy of adopting the methodology that most accurately reflects the actual income taxes the utility will pay.

The district court held the use of Inter-North's weighted cost of debt was in error and that the PUC should have used the capital structure adopted by the PUC. The effect of this error was readily quantifiable and not disputed. The trial court determined the error did not warrant a remand. Instead, the PUC's order was modified pursuant to Minn.Stat. Sec. 14.69 (1982). The PUC does not appeal this modification. Appellant Peoples does not disagree with the trial court modification on this issue either.

Our review of the PUC's order is independent. *See Appeal of Signal Delivery Service,* 288 N.W.2d 707, 710 (Minn.1980); *Minnesota Loan & Thrift v. Commerce Commission,* 278 N.W.2d 522, 525 (Minn. 1979). We agree with the trial court and find there is substantial evidence in the record to support the district court's modification.

### DECISION

The PUC's order, as modified by the trial court in *Peoples Natural Gas Company,* Docket No. G–011/GR–82–65 (Minn. PUC January 28, 1983), is supported by substantial evidence and is not arbitrary or capricious. The order as modified by the trial court is affirmed.

Affirmed.