In the Matter of the Application of PEOPLES NATURAL GAS COMPANY, A DIVISION OF UTILICORP UNITED, INC., for Authority to Increase Its Rates for Gas Service in Minnesota.

No. C2–87–699, C3–87–808.

Court of Appeals of Minnesota.

Oct. 13, 1987.

608

Elmer B. Trousdale, Oppenheimer, Wolff & Donnelly, St. Paul, James R. Talcott, Peoples Natural Gas Co., Council Bluffs, Iowa, for relator Peoples Natural Gas Co.

Lawrence G. Acker, Marlene L. Stein, LeBoeuf, Lamb, Leiby & Macrae, Washington, D.C., Robert S. Lee, Mackall, Crounse & Moore, Minneapolis, for relator M.A. Hanna Co., Inland Steel Mining Co., and Pickands Mather & Co.

Barbara E. Freese, Sp. Asst. Atty. Gen., St. Paul, respondent Dept. of Public Service.

Michael J. Bradley, Dennis D. Ahlers, Sp. Asst. Attys. Gen., St. Paul, respondent Hubert H. Humphrey, III.

Karl W. Sonneman, Sp. Asst. Atty. Gen., St. Paul, respondent Minnesota Public Utilities Com'n.

Heard, considered and decided by POPOVICH, C.J., and NORTON and LOMMEN, JJ.*

## OPINION

A. PAUL LOMMEN, Judge.

Peoples Natural Gas Company, a division of UtiliCorp United, Inc., petitioned the Minnesota Public Utilities Commission for authority to increase rates for gas service in Minnesota in the amount of $8,144,000. The Minnesota Department of Public Service, the Residential Utility Division of the Minnesota Attorney General's Office and several taconite companies were granted leave to intervene. The Minnesota Public Utilities Commission granted an increase of $2,948,000. On April 14, 1987, Peoples petitioned for a writ of certiorari, challenging the Commission orders as to five issues. M.A. Hanna Company, Inland Steel & Mining Company, and Pickands Mather & Company filed a notice of review and petition for a writ of certiorari, challenging the margins which the Commission set for the taconite class sales rate. We affirm.

## FACTS

Peoples Natural Gas Company (Peoples) is a public utility within the meaning of Minn.Stat. § 216B.02, subd. 4 (1984) distributing natural gas at retail in Minnesota, as well as in other states. In Minnesota, Peoples primarily serves rural areas in the southern, eastern, and east central portions of the state. In addition, Peoples serves six large taconite customers located on the Iron Range. When the Minnesota Public Utilities Act was enacted, 1974 Minn.Laws ch. 429, the sale of gas through what is now Peoples was conducted by Northern Natural Gas Company (Northern). Subsequently, Northern established a local distribution operating division and designated it Peoples Natural Gas to distinguish it from Northern's interstate pipeline operations. In 1980, Northern changed its name to InterNorth, Inc., designating Peoples as an operating division responsible for the local distribution of natural gas and Northern as an operating division responsible for the interstate transmission and sale of natural gas in interstate commerce. In 1985, InterNorth sold its Peoples division to UtiliCorp United, Inc. (UtiliCorp), which retained the name Peoples for its operating division responsible for the local distribution of natural gas. In 1986, InterNorth changed its name to Enron, Inc. Peoples purchases

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

approximately 97% of the gas supply for its Minnesota operations from Northern.

On March 17, 1986, Peoples filed a petition with the Minnesota Public Utilities Commission (Commission), requesting authority to increase rates for gas service in Minnesota in a final amended amount of $8,144,000. Intervenors to the action included the Minnesota Department of Public Service (DPS), the Residential Utilities Division of the Office of the Attorney General (RUD–AG) and several taconite companies or taconite agents (taconites), including Eveleth Taconite Company and Eveleth Expansion Company (Eveleth), M.A. Hanna Company, Inland Steel Company, Pickands Mather & Company, as managing agent for Erie Mining Company, Hibbing Taconite Joint Venture, and Reserve Mining Company, and U.S. Steel, a Division of USX Corporation. On April 29, 1986, the Commission accepted the filing, ordered an investigation of the reasonableness of the proposed rates and suspended the proposed rates until January 19, 1987, or until the Commission reached a determination, whichever came first. On May 6, 1986, the Commission ordered a contested case. On May 14, 1986, the Commission authorized interim rates at a level sufficient to collect $5,838,000, subject to refund pending a final order.

Public and evidentiary hearings were held before Allan W. Klein, Administrative Law Judge (ALJ), who issued recommended findings of fact, conclusions of law, and order. After exceptions were taken, the Commission issued its order on January 16, 1987, and its order after reconsideration and rehearing on March 31, 1987.

The rate case is composed of two components. The first is the revenue requirement for the utility, and includes the need for and the reasonableness of the expenses, and the proper rate of return on capital. Peoples filed a petition for a writ of certiorari, contesting five issues relating to the revenue requirement. These include the exclusion from Peoples' rate base of contributions in aid of construction, the exclusion from the rate base of the fixed fee portion of the administrative services agreement,

the determination of the capital structure to be imputed to Peoples and the resultant equity ratio, the pricing of Peoples' convertible debentures at the actual yield of 6.625% rather than the average overall cost of debt of 9.68%, and the reduction of Peoples' projected operating and maintenance expenses by 5%.

The second component is the rate design, in which the Commission designs the rates which govern the collection of revenues from the various classes of customers. Three taconites, Hanna, Inland Steel, and Pickands Mather, filed a petition for a writ of certiorari and a notice of review, challenging the margin set for the taconite class sales rate.

*Contributions in Aid of Construction*

In 1981 and 1982, InterNorth constructed two lengthy pipeline extensions which consisted of a lateral pipeline and a town border station for a total cost of approximately $2.6 million. The entire cost was charged to Peoples, which paid Northern through "contributions in aid of construction." Title to the pipeline remains in Northern. Peoples seeks to include $1,847,928 of its net contributions in its rate base; the Commission excluded it.

The Commission considered the issue previously. In a 1981 order, the Commission approved the inclusion of the contributions in aid of construction in Peoples' rate base, and in a 1983 order, the contributions were not disputed, and were allowed. In a 1984 order it initially reaffirmed its decision. Upon reconsideration, it reversed itself in part, eliminating the cost of construction of the pipeline extensions, while continuing to allow the cost of constructing the measuring and regulating facilities at the town border station in the rate base. It did so because it concluded that Northern's FERC tariff sheet # 56 required a contribution for the measuring and regulating facilities only, and that Peoples was not required to make the contributions for the pipeline extension. It also concluded Peoples attempted to increase its rate base or forestall attempts to reduce rates by making the contributions. Further details are set out in this court's review of that deci-

sion. *In re Peoples Natural Gas Co.*, 358 N.W.2d 684 (Minn.Ct.App.1984), *aff'd*, 389 N.W.2d 903 (Minn.1986).

In the present case, Peoples has again requested inclusion of the contributions in aid of construction for the two pipelines in its rate base. The Commission found that Peoples argued that fundamental fairness required inclusion of the contribution because the extensions are used and useful in generating revenues which are charged to the company's Minnesota revenue requirements, and that there was new evidence to support the inclusion of the contributions.

The Commission further found that the new evidence relied upon by Peoples was testimony by Lloyd Sharp, a former vice president with Peoples, and R.K. Abraham that the contributions were made because at the time the pipeline extensions were built Northern had a policy of requiring contributions, because of the possible limited availability of future gas supplies. According to Abraham, the only exception to this policy occurred if additional contract demand resulted. Sharp testified Northern would have not have requested FERC approval to attach the customers if Peoples had refused to pay the contribution. Sharp also testified Northern required contributions of other distributors and customers.

The intervenors disputed Peoples' assertion regarding Northern's policy. Cross-examination of Abraham by Hanna/Inland showed that the costs of constructing a pipeline to serve the Lake Elmo town border station in 1975 were paid by Northern, which the ALJ found was a deviation from Peoples' policy. Cross-examination of Sharp by Hanna/Inland showed a letter from Sharp to a Northern employee dated May 27, 1980, in which Sharp, referring to the Hibbing and Inland plants, said: "We believe Northern should install the facilities at no contribution as was done when we served the original taconite plants. Please advise if this can be done." The Commission, based on this testimony, found it was reasonable to assume the policy was not unwaivering or uniform. More important, it determined that whether or not Northern had a policy of requiring con-

tributions did not change the rationale relied upon in its decision to exclude the contribution. It concluded the new evidence presented by Peoples did not offer any convincing reasons why the conclusions were no longer valid, or why its decision to exclude the contribution should be changed. It reaffirmed its decision in the prior case.

Peoples sought reconsideration of the determination by the Commission, and attached to its petition affidavits claiming to raise new evidence addressing the circumstances of the Lake Elmo town border station and associated pipeline extension. DPS sought to strike the new evidence, and the Commission granted its motion, determining the evidence was not newly discovered and previously unavailable.

The Commission in its order after reconsideration and rehearing stated that it excluded the contributions in Peoples' previous rate case based on its conclusion that Northern was not required to file its application to the FERC on the basis of reimbursement by Peoples, and, instead, Northern and Peoples voluntarily decided to file on that basis to increase Peoples' rate base. It reaffirmed its earlier decision to exclude the contribution.

*Administrative Services Agreement*

Peoples sought to include the cost of an administrative services agreement between UtiliCorp and InterNorth in the amount of $242,000 in its rate base. UtiliCorp signed the administrative services agreement when it purchased Peoples from Inter-North. It provided for the continuation of certain computer and administrative services to Peoples by InterNorth. The compensation was in two parts: (1) an initial fixed payment of $1,695,000 and (2) hourly or variable fees for services to be performed. Peoples proposed to include in the test year expenses half of the fixed payment allocated to Minnesota, in addition to the projected total of hourly and variable fees.

DPS originally offered direct testimony proposing to disallow the fixed payment. The company responded in rebuttal testimony. DPS then withdrew the testimony. In surrebuttal testimony, DPS specified it

did not intend to continue to recommend exclusion of the $242,000 for the administrative services agreement. The Department's attorney then indicated it might contest the payment. A Department witness testified the Department was not recommending an adjustment; although the witness had no testimony to offer, it was his opinion that the expense was not appropriate. The ALJ found, based on all the evidence, Peoples had met its burden of demonstrating the prudence of the administrative services agreement.

The Commission, however, found that the withdrawal of the DPS testimony prior to the evidentiary hearing and the fact that the witness did not testify did not remove Peoples' burden to prove the expense reasonable. It also determined that DPS did not dispute the amount of the variable and hourly payments in the test year expenses, and found such usage based payments a reasonable method of compensation for services obtained.

The Commission also found that Peoples' evidence showed the agreement itself did not provide that the initial payment offset lower usage rates, the transition period did not coincide with the test year, and the amount of the initial payment was determined as part of the overall negotiations of UtiliCorp's purchase of Peoples. The Commission was unable to determine the estimate of the total difference in cost for services provided with and without the agreement; it concluded that Peoples had not met its burden of proof, and disallowed the initial fixed payment portion of the administrative services agreement from the test year expenses.

*Capital Structure*

In determining the overall revenue requirement of a utility, it is necessary to determine the appropriate ratio of debt to equity, or the capital structure. Peoples, which is a division of UtiliCorp and receives all of its capital, both debt and equity, from UtiliCorp, does not have a capital structure of its own. It was therefore necessary to impute a capital structure to Peoples for use in setting rates.

Peoples proposed the use of a hypothetical capital structure recommended by its witness Dr. Charles Olson. Olson averaged the capital structures for 14 comparable gas companies for the four quarters ending September 30, 1985. In this manner, he arrived at a capital structure consisting of long-term debt of 39.1%, short-term debt of 7.6%, preferred stock of 4.3%, and common equity of 49%.

The DPS and RUD–AG recommended use of UtiliCorp's actual capital structure. The AG's witness, Mr. Schmidt, recommended that in determining the reasonableness of the capital structure, the Commission should attempt to determine the capital structure that results in the lowest rates to consumers while allowing the utility to attract capital on reasonable terms. DPS witness Dr. Updaw also concluded the use of UtiliCorp's actual capital structure was appropriate.

The ALJ determined it was unreasonable to impute the actual capital structure of UtiliCorp to Peoples. He found the common equity component of UtiliCorp was temporarily unreasonably low as a consequence of its corporate acquisition program, and that there was no suggestion the purchase changed the risk of the operation of Peoples. He concluded that the appropriate capital structure for Peoples for the test year period would be as follows: long term debt of 42.1%, short term debt of 8.2%, preferred equity of 4.7% and common equity of 45%. He based this recommendation on the comparable company analysis and on the stated intent of UtiliCorp to maintain a 45% common equity ratio.

The Commission disagreed and determined that the capital structure of Peoples' parent company UtiliCorp should be used. It determined this was appropriate because UtiliCorp is engaged only in regulated activities, and there is no reason to believe the capital structure chosen by UtiliCorp was influenced by holdings substantially more risky than Peoples. It also found that UtiliCorp made representations to the Commission at the time of the purchase of Peoples concerning the benefits to rate

payers of UtiliCorp's lower cost capital structure. It determined the following capital structure as proposed by the RUD–AG the most reasonable capital structure presented: long-term debt of 47%, short-term debt of 8.9%, preferred stock of 6.3% and common equity of 37.8%.

*Convertible Debentures*

During the test year, UtiliCorp issued $50 million in convertible debentures. The Commission determined that these convertible debentures should be treated as long term debt for purposes of determining the capital structure. It priced them at their actual cost of 6.625%, rather than the average embedded cost of debt of 9.68%. Peoples maintains that because of the equity characteristics of the convertible debentures they should be priced at 9.68%.

The ALJ determined that the convertible debentures were appropriately priced at their yield component of 6.625% rather than 9.68%. The Commission agreed, because this reflects the actual test year cost to Peoples and UtiliCorp for securing the capital.

*Operation and Maintenance Expenses*

Peoples based its rate case on a projected test year for the 12–month period beginning May 1, 1986. When using a fully projected test year, the utility must estimate expenses to calculate its requested rate increase. The RUD–AG challenged the accuracy of Peoples' operation and maintenance expenses (O & M), based on inaccuracy in past cases and the unusually large increase in the projections for the test year. RUD–AG witness Nelson recommended that Peoples' projected O & M expenses be reduced by 5%, in an amount of $747,000. His recommendation was based on his comparison of Peoples' O & M expenses in its last two rate cases with the actual expenses, and comparison of Peoples' O & M budget for the last four years with the actual expenses.

In 1982 and 1983, the expenses were under the budgeted amount, by 7.1% and 9.7% respectively. Peoples explained that this occurred because of the significantly greater amount of inflation which existed when the 1982 and 1983 budgets were pre-pared, and because in 1982, the company invoked an extraordinary expense control program. In 1984 the expenses were 3.4% under budget, and in 1985, the expenses were 5% over budget.

The ALJ did not recommend the 5% decrease, determining that while the 1982 and 1983 calendar year expenses did not arise to the amount predicted, the 1984 and 1985 years were within reason. He also recognized there were valid reasons for the earlier discrepancies, and determined that the company demonstrated the reasonableness of its projected operating and maintenance expenses.

The Commission, however, determined that Peoples had exhibited a pattern of incorrectly budgeting expenses. It found it reasonable to assume the historical pattern continued, and that budget expenses were overstated. It also disagreed with the ALJ that the reasons for the discrepancy in the 1982 and 1983 years were valid. It determined the five percent reduction of O & M expenses were valid, and reduced the test year expenses by $747,000.

*Taconites*

In setting the rate design, the Commission first had to adopt a class of cost service study, in which the cost of serving each customer class is determined. Three studies were presented to the Commission; it chose the one proposed by Peoples. The cost study, which was based upon the assumption that Peoples' revenue requests would be granted, proposed a reduction in the taconite rates of 1.7%.

Peoples' proposed rates for the taconites, which were subsequently adopted by the Commission, consisted of three parts: a customer charge of $100 per month, a decrease in the demand charge from $1.54 per Mcf to .80 per Mcf, and a decrease in the commodity charge from $.0721 per Mcf to $.04 per Mcf. The Commission rejected DPS' proposed rates for the taconites, which would have resulted in an overall class increase. It also rejected rates proposed by Pickands Mather and Eveleth, with maximum demand and commodity margins approximately one-half those pro-

posed by Peoples. The final class revenue requirements reflecting the revenue increase and the rate design authorized by the Commission resulted in a decrease of 1.79% or $566,445 to the taconites.

Thus, while the Commission lowered Peoples' revenue requirement by over $5 million, the taconite class sales rate remained at the level which was originally proposed by Peoples. The taconites had presented evidence as to the declining market for taconite and increased competition in the taconite industry. They also presented evidence showing the taconite plants have the capability to use alternative fuels, and that new FERC rules make it likely taconites can purchase fuel from suppliers other than local distributors such as Peoples. The taconites argue that their rates should have been decreased further because of these factors.

## ISSUES

1. Should the contributions in aid of construction made by Peoples Natural Gas Company be excluded from Peoples' rate base, and a related depreciation expense excluded from the test year expenses?

2. Should a fixed fee paid pursuant to an administrative services agreement be excluded from the test year expenses?

3. Did the Commission use inconsistent standards when it imputed the capital structure of UtiliCorp, Peoples' parent corporation, to Peoples?

4. Should the convertible debentures issued by Peoples' parent corporation be priced at their actual yield of 6.625% or at the average overall cost of long-term debt of 9.68%?

5. Was the 5% reduction in Peoples' projected operations and maintenance expenses supported by substantial evidence?

6. Did the Commission properly establish the margins for the taconite class sales rate?

## ANALYSIS

### Scope and Standard of Review

The scope of judicial review of an administrative agency's decision is found in Minn. Stat. § 14.69 (1986), which states that courts may reverse or modify an agency's decision only if the decision is:

(a) In violation of constitutional provisions; or

(b) In excess of the statutory authority or jurisdiction of the agency; or

(c) Made upon unlawful procedure; or

(d) Affected by other error of law; or

(e) Unsupported by substantial evidence in view of the entire record as submitted; or

(f) Arbitrary or capricious.

The fundamental concept underlying judicial review is that the agency decisions "enjoy a presumption of correctness, and deference should be shown by courts to the agencies' expertise and their special knowledge in the field of their technical training, education, and experience." *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 824 (Minn.1977).

Proceedings before the Commission involve two distinct agency functions: quasi-judicial and legislative. Minn.Stat. § 216A.05, subd. 1 (1986). In the rate-making context, the establishment of a rate of return is a quasi-judicial function, and the allocation of rates among various classes of utility customers is a legislative function. *Hibbing Taconite Co. v. Minnesota Public Service Commission*, 302 N.W.2d 5, 9 (Minn.1980).

The standard for reviewing these functions differ. *Id.* The establishment of a rate of return, which involves a factual determination, will be reviewed under the substantial evidence test. *Hibbing Taconite*, 302 N.W.2d at 9. When the Commission's findings of fact and conclusions determined from those facts are challenged, the Commission's decision should be affirmed where the findings of fact are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Reserve Mining*, 256 N.W.2d at 825. Substantial evidence is not directed solely toward the quantity of evidentiary support for an administrative determination, but also requires an agency

to explain its methodology or reasoning when support for its conclusion is not readily discernible from the record, such as when the agency must make a judgment call. *Minnesota Power & Light Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 324, 329 (Minn.1983). The burden is on the appellant to show the agency's findings were not supported by record evidence considered in its entirety. *Reserve Mining*, 256 N.W.2d at 825. The agency's judgment concerning the inferences to be drawn from the facts shall not be rejected even though the court may be inclined to draw contrary inferences, unless there is manifest injustice. *Id.*

■ When the Commission is engaged in a legislative capacity, as it is when it allocates rates among classes of customers, its decision will be upheld unless it exceeds the scope of its authority, or results in unjust, unreasonable or discriminatory rates by clear and convincing evidence, producing an arbitrary result. *Hibbing Taconite*, 302 N.W.2d at 9; *St. Paul Area Chamber of Commerce v. Minnesota Public Service Commission*, 312 Minn. 250, 262, 251 N.W.2d 350, 358 (1977).

■ Where an agency's decision represents its will, and not its judgment, the agency has acted arbitrarily or capriciously. *Markwardt v. State, Water Resources Board*, 254 N.W.2d 371, 374–75 (Minn. 1977). If an agency's action departs from precedent, it is not arbitrary or capricious if the agency explains the reasons for its departure from the precedent. *Peoples Natural Gas Co. v. Minnesota Public Utilities Commission*, 342 N.W.2d 348, 352–53 (Minn.Ct.App.1983), *pet. for rev. denied* (Minn. Apr. 24, 1984), *citing McHenry v. Bond*, 668 F.2d 1185, 1192 (11th Cir. 1982).

■ When an administrative agency's decision is based on legal rather than factual considerations, the reviewing court is not bound by the decision of the agency and, generally, need not give deference to the agency's expertise. *Frost–Benco Electric Association v. Minnesota Public Utilities Commission*, 358 N.W.2d 639, 642 (Minn. 1984).

While we may not agree with the Commission's decision on every point, we are bound to review the decision under the scope of review set forth above.

## I. Contributions in Aid of Construction

■ Peoples contests the exclusion of the contributions in aid of construction from its rate base. It first argues that the contributions should be included in the rate base because the pipelines are "used and useful." Under Minn.Stat. § 216B.16, subd. 6, a utility is entitled to a reasonable return on its investment for "property used and useful in rendering service to the public." *Senior Citizens Coalition v. Minnesota Public Utilities Commission*, 355 N.W.2d 295, 300 (Minn.1984). However, subdivision 6 refers several times explicitly to "utility property." The pipelines are not Peoples' utility property, and it may not claim it is entitled to a reasonable return under the "used and useful" theory.

■ Peoples argues that it is entitled to include the contributions in its rate case because it has offered evidence showing that it was required to pay the contributions to Northern in order to provide service to the taconite customers. It argues that the Commission acted "unlawfully, arbitrarily, capriciously, and without adequate support in the evidence" when it disallowed the contributions. Peoples also argues that the Commission acted arbitrarily when it failed to consider "newly discovered evidence" which it attached to its petition for rehearing before the Commission.

The Commission declined to consider evidence presented for the first time with the petition for rehearing and reconsideration, finding that the material was available prior to the close of the record. The Commission properly excluded this evidence.

The issue of whether the contributions should be included in the rate base has been addressed in previous rate cases and reviewed on appeal. *Peoples*, 358 N.W.2d at 689–90. The Commission in this case found it reasonable to assume, based on the evidence, that Northern's policy to require contributions in aid of construction

because of possible limited availability of gas supplies was not "unwaivering or uniform." It further determined that whether or not Northern had such policy did not change the rationale relied on by the Commission in its decision to exclude the contributions. In its order after the rehearing and reconsideration, it reiterated that:

> The Commission excluded the contributions in Peoples' previous rate case based upon its conclusions that Northern was not required to file its application to the FERC on the basis of reimbursement by Peoples of the pipeline extensions; rather, Northern and Peoples voluntarily decided to file on that basis in order to increase Peoples' Minnesota rate base.

As in the previous case, the Commission's conclusions that Peoples was not required to make the contribution in aid of construction under the FERC tariffs and its concern regarding the attempt to manipulate the rate system were supported by substantial evidence on the record. *Peoples*, 358 N.W.2d at 689.

## II. Administrative Services Agreement

■ Peoples asserted that the fixed and variable portions of the administrative services agreement should be included in the rate base; the ALJ recommended this be done. The Commission allowed the inclusion of the variable portion of the payments, finding such usage based payments were a reasonable method of compensation for the services obtained. It disallowed the fixed portion, concluding that Peoples did not meet its burden of proving the payment was related to the services obtained, or that the amount was reasonable.

Peoples had asserted that the administrative services agreement lowered hourly rates for the services. The Commission was unable to determine the difference from the record. It further found that the initial payment was a one-time expense for the one-time purpose of transition of services previously provided by InterNorth. It determined that the cross-charges from InterNorth at least for data processing were expected to conclude prior to the end of the test year, and that this mismatch of the transition period to the test year cast further doubt on the propriety of the proposal. It also found it logical to consider the payment, which was determined as part of the overall negotiations of UtiliCorp's purchase of Peoples, a purchase of the excess of cost over book value that UtiliCorp paid for Peoples.

Peoples argues that the Commission used an erroneous legal standard, because it applied a presumption of unreasonableness test, and placed the burden of establishing the reasonableness of the expense in the first instance on Peoples. It argues that expenses are presumed reasonable, and only when evidence is offered tending to show the expenses are unreasonable must the utility justify them, citing *West Ohio Gas Co. v. Public Utilities Commission of Ohio*, 294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761 (1935).

In *West*, the company claimed expenses incurred in procuring new business amounting to, on the average, $12,000 per year. *Id.* at 72, 55 S.Ct. at 321. The Commission did not question the fact of the payment, but reduced the allowance to $5,000 per year, on the ground that anything more was unnecessary and wasteful. The Supreme Court held:

> The criticism has no basis in evidence, either direct or circumstantial. Good faith is to be presumed on the part of the managers of a business. * * * In the absence of a showing of inefficiency or improvidence, a court will not substitute its judgment for theirs as to the measure of a prudent outlay.

*Id.*

The issue of the burden of proof was also recently addressed in *In re Continental Telephone Co.*, 389 N.W.2d 910, 913–14 (Minn.1986), when the attorney general's residential utility division challenged the inclusion of a "cash unreserved account" in Continental's rate base without a concomitant inclusion of the interest earned on that account in its operating income. The supreme court noted that under the statute addressing rate changes for telephone and telegraph companies, Minn.Stat. § 237.075, subd. 4, the burden of proof to show the

rate change is just and reasonable is on the telephone company seeking the change. It held:

> The burden cast on the petitioning telephone company is to prove to MPUC's satisfaction the accuracy of its proposed inclusion of assets in the rate base and its proposed revenue requirements to be realized from its requested schedule of increased rates. If the evidence does not permit determination of the proper composition of the rate base or the amounts and sources of income to be included in the computation of the telephone company's revenue requirements, the telephone company has failed to sustain its burden of proving that its proposed rate change is just and reasonable. In such event MPUC must either deny the rate increase in its entirety or make appropriate adjustment to the company's proposal.

*Id.* at 916. Similarly, under Minn.Stat. § 216B.16, subd. 4, the burden of proof to show the rate change is just and reasonable is on the public utility seeking the change. We believe that the presumption referred to in *West* applies to routine business expenses, rather than the one-time expense at issue here. Further, the Commission determined that the expense was not appropriately included in the rate base. The Commission did not use an erroneous rule of law when it decided to exclude the fixed portion of the administrative services agreement expense from the rate base.

### III. Capital Structure

■ Peoples is wholly owned by its parent, UtiliCorp, and has no capital structure of its own; it is therefore necessary to impute one. Peoples proposed the use of a capital structure based upon the average capital structure of 14 similar gas utility companies. The ALJ recommended the adoption of such a structure, using a common equity ratio of 45%, which is the common equity ratio UtiliCorp intended to maintain. The Commission declined to accept the ALJ's recommendation and imputed a capital structure based upon UtiliCorp's capital structure, with a common equity ratio of 37.8%.

Peoples asserts that the Commission erred as a matter of law because it was inconsistent in determining capital structure; when InterNorth was Peoples' parent company, the Commission adopted a structure based upon a comparable group of companies, finding that the use of InterNorth's capital structure was not appropriate. In this case, the Commission determined that the use of the capital structure of the parent company was appropriate. Peoples asserts that the only common thread in the Commission's decision is that the capital structure which produces the lowest equity component is used. It asserts the inconsistent standard constitutes an error as a matter of law.

We will first address the claim that the Commission has employed an inconsistent standard for determining the capital structure.

In *Peoples,* 342 N.W.2d at 353, this court examined conditions which the Commission requires must exist before another capital structure will be substituted for the parent company's capital structure. First, the parent company must be proven riskier than the typical gas distributors. Second, this excess risk must be the cause of an equity ratio which is too high. In Peoples' first rate case, the Commission adopted the capital structure of Peoples' then parent company, InterNorth, concluding that the record did not establish the existence of either condition. *Id.* In the rate case reviewed in *Peoples,* the Commission declined to accept InterNorth's capital structure, and instead imposed a hypothetical structure based upon an average of ten gas distribution companies comparable to Peoples. *Id.* at 350. Peoples challenged the decision as arbitrary and capricious because previous Commission decisions rejected the imposition of such a hypothetical capital structure. This court determined that the Commission did not depart from the principles it had established; instead, the evidence in the record changed. *Id.* at 353.

The Commission determined in this case that because UtiliCorp is engaged only in regulated activities, there was no reason to

presume that the capital structure chosen by UtiliCorp was influenced by holdings substantially more risky than Peoples. It also determined that there were two important differences between InterNorth, Peoples' previous parent, and UtiliCorp, Peoples' current parent, indicating it was appropriate here to use UtiliCorp's capital structure:

First, UtiliCorp's common equity ratio of 37.8 percent is lower than InterNorth's 45.654 percent common equity ratio, indicating that the UtiliCorp capital structure is not unreasonably costly to ratepayers. Second, InterNorth was engaged in some unregulated and potentially more risky operations, whereas UtiliCorp is engaged in only regulated activities.

The Commission further found that UtiliCorp argued at the time of purchase of Peoples that ratepayers would obtain the benefit of UtiliCorp's lower cost capital structure if its purchase was approved. It determined that the ratepayer should obtain the benefit of the lower, more traditional equity ratio that was promised by UtiliCorp.

The Commission followed the standard set out in *Peoples,* and it did not err as a matter of law when it used the capital structure of Peoples' parent company.

### IV. Convertible Debentures

UtiliCorp issued $50 million in convertible debentures. The convertible debentures have both equity and debt features, and the issue arose as to whether they should be treated as equity or long-term debt in the capital structure. The Commission treated them as long-term debt for purposes of determining the capital structure, and Peoples did not contest this determination.

■ The issue then arose as to whether the debentures should be priced at their actual cost of 6.625%, rather than the average embedded cost of long-term debt of 9.68%. Peoples contends that it is arbitrary and capricious to treat the debentures as pure debt for capital structure purposes and not employ the average yield on long-term debt for purposes of determining the costs of the debt capital.

The Commission priced the convertible debentures at their yield component of 6.625%:

The Commission concludes in this case as it has found previously that the average embedded costs of debt and preferred stock for the test year are appropriate and reasonable cost rates to apply to these portions of capital structure. The embedded cost rates reflect the actual costs incurred by UtiliCorp to secure the capital used by Peoples to provide utility service to Minnesota customers. It is well established that the utility ratepayers should pay for the actual costs incurred by the utility to provide utility service. Because UtiliCorp will pay its bond holders only the actual cost, an allowance for current market costs greater than this amount would simply accrue as a windfall gain to the equity owners of the Company. The argument that utility ratepayers should pay the current market average costs of debt and preferred stock instead of actual costs has not been demonstrated to be reasonable.

The Commission's decision is based upon the evidence and sound reasoning, and is not arbitrary or capricious.

### V. Operating and Maintenance Expenses

■ The last issue which Peoples raises is the Commission's decision to reduce its projected O & M expenses by five percent. Witness Curtis Nelson recommended this reduction, based upon a comparison of the previous operating and maintenance expenses in the last two rate cases with actual expenses, and comparison of Peoples' operating and maintenance budget for the last four years with the actual expenses. Peoples' witness offered explanations for these variations. The ALJ agreed that the company demonstrated the reasonableness of its projected O & M expenses and that no adjustment was appropriate. The Commission rejected the explanation, determining that the reasons presented by the company and accepted by the ALJ did not adequately explain the variances, particularly the overstatements in Peoples' two

previous rate cases. The Commission examined the reasons in detail, and determined that Peoples' explanation of the overbudgeting was not credible. The Commission's decision was supported by substantial evidence and we will not reverse.

### VI. Taconite Class Sales Rate

 The taconites challenge the sales rate which the Commission determined was appropriate for their class. Minn.Stat. § 216B.03 provides that:

> Every rate made, demanded, or received by any public utility * * * shall be just and reasonable. Rates shall not be unreasonably preferential, unreasonably prejudicial or discriminatory, but shall be sufficient, equitable and consistent in application to a class of customers. * * * Any doubt as to reasonableness should be resolved in favor of the consumer.

The parties first argue as to the appropriate scope of review. The allocation of rates among various classes of utility customers, which is the issue here, constitutes a legislative function of the Commission. *Hibbing Taconite*, 302 N.W.2d at 9. The supreme court has clearly set out the appropriate scope of review in *Hibbing Taconite*:

> When the [Commission] acts in a legislative capacity as in rate increase allocations, balancing both cost and noncost factors and making choices among public policy alternatives, its decision will be upheld unless shown to be in excess of statutory authority or resulting in unjust, unreasonable, or discriminatory rates by clear and convincing evidence.

*St. Paul Area Chamber of Commerce*, 312 Minn. at 262, 251 N.W.2d at 358 (quoted in *Hibbing Taconite*, 302 N.W.2d at 9).

The Commission adopted the sales rate which Peoples originally proposed, although it reduced the proposed revenue increase of $8,144,000. The taconites argue that the taconite class was thus excluded from the benefits of the revenue reduction which the other classes received. They assert that the Commission performed a faulty balancing of cost and noncost factors, amounting to arbitrary and capricious decision-making, and resulting in

a subsidy by the taconite class of other classes. They also argue the Commission's decision was not supported by the evidence.

We will first examine the Commission's decision-making process. Taconite rates were proposed by DPS, Peoples, and several of the taconites. The Commission determined that the rate structure proposed by Peoples was reasonable. It accepted the argument that the taconite sales rate must be responsive to market conditions because of the taconites' vulnerability to competition and their access to alternative sources of fuel.

The Commission rejected a DPS taconite rate proposal which would have resulted in a 61% increase in demand charges, finding it did not take into account the effect of the increase on the financial health of the taconite class. The Commission also rejected a proposal by Pickands Mathers, which would have lowered taconite rates to approximately half of those proposed by Peoples. It found that adopting the taconites' proposal would reduce taconite rates to a level where the margin would be smaller than justified by market conditions, to the detriment of the other rate payers.

In its order after reconsideration and rehearing, the Commission addressed the taconites' argument that their margin sales rate should be determined in accordance with the rerun of Peoples' cost of service study pursuant to the revenue requirements set by the Commission, and that the margin rates should then be set in accordance with the Commission approved revenue requirements.

The Commission stated that its decision to reduce taconite class rates by 1.7% was in response to the competitive and financial condition of the taconite industry and the likelihood Peoples' taconite customers would bypass Peoples' system. The Commission also noted that rate design changes should be reasonable and gradual, and that to further reduce taconite rates would further increase rates to other classes. The Commission provided the taconites with a slight rate decrease based on cost, but rejected a taconite proposal that the taconite rates should be moved even closer to cost. It concluded:

The Commission finds that it was reasonable to set Taconite rates that are responsive to market conditions faced by Peoples' Taconite customers and also ensure a reasonable contribution to system costs.

In *Reserve Mining v. Minnesota Public Utilities Commission*, 334 N.W.2d 389, 392 (Minn.1983), the supreme court addressed a contention that rates to the taconite class were unjust, unreasonable, and discriminatory because they were based on an unreasonably disproportionate allocation of the costs of Peoples' distribution system to the costs of serving the taconite class. The court rejected the contention that the cost of providing service should be the most important consideration in setting rates, recognizing

> that rate levels for a class must ultimately be the product of many countervailing considerations, including noncost factors as well as the results of cost studies.

*Id.* at 393. It recognized a number of noncost factors which may be considered in assigning revenue responsibilities, including the volatility of sales to the taconite class, the impact a rate change would have on different customers, the ability to pay, the ability to pass on the increased cost of energy, and the ability of businesses to realize part of an energy cost increase on income tax savings. *Id.*

The Commission considered the various proposals in detail, and weighed both cost and noncost factors. Upon this record, the taconites have not met their burden of proving by clear and convincing evidence that the rates established are unreasonable, based upon all the factors, costs and noncost, which the Commission may consider in assigning revenue responsibilities.

### DECISION

The orders of the Minnesota Public Utilities Commission are affirmed.

Affirmed.